**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

| | | |
|---|---|---|
| BRET THIELEN, individually and on behalf of a class of similarly situated individuals, | ) ) ) | |
| Plaintiff, | ) ) | No.  1:06-CV-0016 |
| v. | ) ) | Judge Gordon J. Quist |
| BUONGIORNO USA, INC., a Florida Corporation, d/b/a BLINKO | ) ) ) | **Jury Trial Demanded** |
| Defendant. | ) | |

------------------------------------------------------------x

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Bret Thielen brings this class action complaint against defendant Buongiorno USA, Inc. d/b/a Blinko f/k/a Dirty Hippo ("Blinko") seeking to stop defendant's practice of making unsolicited text message calls to cellular telephones and its practice of systematically billing consumers for mobile content services that they never purchased, and to obtain redress for all persons injured by its conduct.  For his class action complaint, Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

### NATURE OF THE CASE

1.     This lawsuit challenges Blinko's policies and practices as relates to the marketing and sale of its third-party mobile content  "Short Message Service" delivery services and seeks redress for the literally thousands of unwitting consumers that Blinko sent text message calls to without Blinko's having properly obtained the called parties' permission, conduct which has caused such consumers actual harm, not only because they were subjected to the aggravation that

necessarily accompanies unsolicited wireless spam, but also because (a) in virtually all instances they actually pay their cell phone service providers for the receipt of such wireless spam and, (b) were unwittingly subscribed to, and billed for, Blinko's monthly mobile content services, which services were never ordered, and which could not easily be cancelled, if at all.

2.     In order to redress these injuries, Thielen, on behalf of himself and a nationwide class, brings suit under the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.*, (the "TCPA") which prohibits unsolicited voice and text calls to cell phones.

3.     On behalf of the class, Thielen seeks an injunction requiring Blinko to cease all wireless spam activities and to cease billing consumers for mobile content services that they never agreed to purchase and an award of actual and statutory damages to the class members, together with costs and reasonable attorney's fees.

## PARTIES

5.     Plaintiff Bret Thielen is a citizen of Michigan, residing in Kent County, Michigan.

6.     Defendant Blinko is a self-proclaimed "international company active in the field of multimedia contents for telephony and digital channels. Blinko is one of the first companies to reach a worldwide audience in the mobile Value Added Services area, and is a clear market leader in the United States, Europe, and Latin America."  It is a Florida corporation with its principal place of business in Miami Beach, Florida.  It does business throughout the United States, including Kent County, Michigan.

## JURISDICTION

7.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because (a) at least one member of the putative class is a citizen of a state different

2

from Blinko, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection applies to the instant action.

## VENUE

8.      Venue is proper in this district under 28 U.S.C. §§ 1391(a)(1) and 1391(a)(2).

## CONDUCT COMPLAINED OF

9.      Blinko began its business operations in or about January 2005, during which, for a period of time, it operated under the name Dirty Hippo (hereinafter Blinko and Dirty Hippo are collectively referred to as "Blinko").

10.     Since it began operating, Blinko has provided third-party mobile content delivery services (each, a "service") that allow users to download to their compatible mobile device various mobile entertainment content, such as ringtones, wallpapers, games, graphics, horoscopes, data, news, and information transmitted or received via chat services (collectively, "content") via various means of mobile content delivery, including "Short Message Service" or "SMS" delivery.

11.     "Short Message Service" or "SMS" is a messaging system that allows cellular telephone subscribers to use their cellular telephones to send and receive short text messages, usually limited to 160 or so characters, on their cellular telephones.  An "SMS message" is a text message call directed to a wireless device through the use of the telephone number assigned to the device.

12.     Blinko's terms of use require that a user (1) have a mobile communications subscription with a participating carrier or otherwise have access to a mobile communications network for which Blinko makes the service available, (2) provide all equipment and software

3

necessary to connect to the service, including, but not limited to, a compatible mobile device that is in working order, (3) agree to pay all service and other fees associated with such mobile communications access (including, for instance, all standard messaging fees charged by that users' mobile service provider, (4) register for or sign-up for services (which, according to Blinko is determined by it at its sole discretion), and (5) agree to pay subscription fees associated with the services invoiced on said users' mobile service provider's bill, services which typically cost $9.99 a month.

**Blinko's Affiliate Marketing Program**

13.     Blinko's services are primarily marketed on the internet through an "affiliate marketing" advertising model, an increasingly popular method of promoting web businesses in which affiliates (i.e., third-party advertisers) looking to earn revenue from internet traffic on their own websites promote merchants (i.e., sellers of goods or services) through advertising links on the affiliates' sites.

14.     Affiliates are compensated for every visitor, subscriber and/or customer provided to the business through their efforts, typically based on a certain value for each visit (Pay per click), registrant (Pay per lead), or customer or sale (Pay per Sale), or any combination thereof.

15.      Typically, merchants and affiliates join an "affiliate network," a value-added intermediary, such as Commission Junction, Linkshare or AzoogleAds, that provides various tools and services relating to the creation and management of affiliate marketing programs.  For merchants, services can include providing tracking technology, reporting tools, payment

4

processing, and access to a large base of affiliates.  For affiliates, services can include providing one-click application to new merchants, reporting tools, and payment aggregation.

16.     Due to the enormous profits that can be made and the virtual non-existence of effective policies and procedures for controlling affiliate behavior, the affiliate industry has historically been plagued by widespread and rampant forms of affiliate abuse, including false advertisements, forced mouse clicks to get tracking cookies set on users' computers, spyware, password hacking, cloning and others.

17.     Blinko and its third-party affiliate advertisers (hereinafter "Blinko affiliates") joined AzoogleAds.com Inc.'s ("Azoogle's") affiliate network, among others.  Blinko offered to compensate affiliates for every visitor, subscriber and/or customer provided to Blinko through the affiliates' efforts.

18.     On information and belief, Blinko failed to have in place effective and enforceable policies and procedures for monitoring and controlling affiliate behavior, and to guard against affiliate abuse, including the unauthorized entry of data in Blinko's and its affiliates' websites.

**Blinko's Flawed Subscription Activation Process**

19.     According to Blinko, before a subscription to its services begins, a user must initiate the activation process by (a) sending a text message to a "short code" (i.e., a special telephone number, significantly shorter than a full telephone number, which can be used to address SMS messages from mobile telephones) licensed by Blinko (e.g., Blinko's short codes

5

include, for instance, the numbers "42222" "25000" and "69069"); or by (b) entering a phone number in the website of one of its many affiliate advertisers.

20.     Any of these actions will trigger in Blinko's computer platform the automatic delivery of a text message to that phone number containing a Personal Identification Number ("PIN"), and asking the called party to confirm activation by (a) entering the PIN on the affiliate advertiser's website or (b) by replying to the message received (the "PIN message") with a text message confirming activation (by, for example, sending a text message to Blinko's short code 42222 with the words "MY PRANK," the name of a particular Blinko mobile content service).

21.     The body of a typical PIN message states as follows:

> Your Code is <PIN>. Enter this number on the page or txt MY
> PRANK to 42222 to start the service! Visit blinko.com for
> additional services.

22.     Once a subscription is confirmed, the phone number provided to Blinko is stored by Blinko's computer platform in a "list" with all the other phone numbers that purportedly have subscribed to that service.  The computer platform is designed to automatically send to the subscribers in the list the following additional scheduled messages related to that service: (1) Welcome message with unsubscribe information; (2) Sample content (download or text, depending on the service; (3) monthly content messages; (4) monthly "advise" of charges; and (5) monthly billed messages.

23.     Instead of telling subscribers the cost of its service in the PIN messages before they subscribe, only *after* purported subscribers have supposedly confirmed their subscription does Blinko send the "welcome message" wherein information about subscriptions, charges and cancellations are supposedly provided:

6

> Welcome to the PRANKSTER service.  4 help contact
> care@blinko.com or call 800-971-2271.  U can unsubscribe by
> sending STOP to 42222.  9.99/month

24.     Where, however, the purported subscribers are not able to be billed by their

mobile carriers, due to an alleged software glitch, for example, the purported subscriber will not

be sent a welcome message from Blinko, but will be sent all other scheduled text message calls,

including for example, one of Blinko's promotional requests to re-subscribe:

> Here is another chance to receive your text alerts from Blinko.com.
> Simply reply with txt MY PRANK.

**Blinko Lacks Effective Policies and Procedures to Verify That**
**Persons Who Enter Cell Phone Numbers And/Or PINs On Blinko's**
**or It's Affiliate Sites Are Authorized To Do So**

25.     As part of the subscription activation process, Blinko does not require that a

potential subscriber provide any information to Blinko other than a cellular phone number.

26.     According to Blinko's privacy policy, "a mobile phone number is the only

information that is gathered from users of the Services under normal circumstances."

27.     Additionally, according to Blinko's terms of use, "Blinko, in its sole discretion,

shall determine what means of identification shall be appropriate for your use of the Services,

and Blinko may choose to limit your Registration Data to a mobile telephone number."

28.     Blinko does not require a potential subscriber to provide his or her name, postal

address, email address or any other form of identification.  Indeed, as a general matter, Blinko

claims not have the names and addresses of its subscribers, only their cell phone numbers.

29.     Moreover, Blinko cannot, as a general matter, (a) identify by name or otherwise

any "person" who allegedly entered his or her phone number or PIN number on Blinko's or its

affiliates' website, (b) identify the internet website, by URL (uniform resource locater) or otherwise,  through which any potential subscriber allegedly entered his or her cell phone number or PIN number; (c) identify the IP (internet protocol) address of and the ISP associated with the device from which said cell phone number or PIN number was provided; or (d) identify the time, date and manner of a potential subscribers' response to any one its affiliates' advertisements.

30.     Moreover, Blinko does not require a potential subscriber to verify, via credit card authorization or other means, the potential subscriber's identity, age, or authority to consent to the receipt of text messages to the phone number provided to Blinko.

31.     Since Blinko began operations, anyone – including an *affiliate* marketer –  could visit Blinko's or any one of its affiliates' websites and enter *someone else's* phone number on the site to initiate the activation process, and in turn, trigger the automatic delivery of a text message by Blinko's computer platform to that cell phone number.

32.     As one Blinko victim, Libia V., warned Blinko back in September of 2005 when she emailed Blinko's customer support,

> All this big mess happend because a friend of mine received an email saying that he could get a free ring tone and decided to put my cell phone # on the web. As soon as I received the txt msgs, I sent a txt msg to a number and wrote STOP to unsubscribe and never visited the website jamsters.com or put the password you sent me.

33.     Similarly, and shockingly, apparently anyone could obtain a particular phone number's supposed uniquely generated PIN number simply by visiting Blinko' website, entering the phone number, and requesting that Blinko send a copy of the PIN to whatever email address that person chooses to provide.  Indeed, according to Blinko's "Didn't Receive Your Password?"

internet support webpage, "If you are still having issues receiving your password, please enter your mobile number and e-mail and we will send you the password via e-email."  Blinko, of course, has no means of verifying the authenticity of said email addresses, since under normal circumstances, it claims not to collect such information.  Thereafter, the PIN can be entered into Blinko's or its affiliates' website without the subscriber's authorization.

34.     In short, Blinko lacks effective policies and procedures to ensure that whoever enters a cellular telephone number and/or PIN number on Blinko's or its affiliates' websites is, in fact, authorized to enter said telephone number or PIN number.

35.     Similarly, Blinko lacks effective policies and procedures to ensure that affiliate marketers cannot enter potential subscribers' cell phone numbers and/or PIN numbers on Blinko's or its affiliates' websites, despite the obvious benefit to them from doing so.

36.     By allowing cell phone numbers to be entered on Blinko's or its affiliates' sites without verification of the potential subscriber's identity, age, and authority to consent to the receipt of text messages to the phone number provided to Blinko, it has unnecessarily caused thousands of unwitting consumers to be sent text message calls (hereinafter, "wireless spam" or "SMS Spam") via Blinko's computer platform without Blinko's having properly obtained the called parties' permission.  Unlike more conventional spam, wireless spam actually costs its recipients money, because virtually all cell phone users must pay for each text message call they receive.

37.     Similarly, by allowing PIN numbers to be obtained from, and thereafter entered on, Blinko's or its affiliates' sites without verification of the potential subscriber's identity, age, and authorization to be both sent text messages to their phone numbers and subscribed to and

9

charged for Blinko's monthly services, Blinko has unnecessarily caused thousands of unwitting consumers to be sent wireless spam, and caused them to be subscribed to and billed for Blinko's monthly mobile content services, all without their authorization.

38.     As one frustrated Blinko victim, Brian D., explained, on New York's Times Herald-Record's website blog recordonline.com:

> I had had my cell phone number for almost two years before Blinko signed me up for their service completely out of the blue. I also did not receive any type of PIN number as he [Burton Katz, president of Blinko] suggested. My subscription to Blinko was not the two-step process he describes... it was a zero-step process.  All of the complaints I've read from others have been the same. Also, I had unsubscribed with the exact word "STOP" and it did not stop the service.

**Blinko's Phantom Charges and**
**Negative Option Subscriptions**

39.     As a consequence of having been sent wireless spam, consumers were unwittingly subscribed to and billed for, via "negative option subscriptions," Blinko's monthly mobile content services.  Negative option subscriptions refer to offers that take effect unless the customer rejects them.

40.     On information and belief, Blinko's computer systems are programmed to treat non-responses or failures to reply to Blinko text calls as "acceptances and acknowledgments" of subscriptions to Blinko's services. In other words, unbeknownst to consumers, by doing nothing, or for example, by simply opening and/or reading  Blinko text messages, they are purportedly subscribing to Blinko's services and agreeing to be charged monthly service fees through their phone carrier.

41.     Another Blinko victim named Sean in San Diego writes in the Times

Herald-Record's website blog recordonline.com:

> I originally contacted Verizon today about this charge and they
> lectured me that I *MUST* have subscribed. I told them I rarely
> send text messages and because there are so few, my OUTBOX
> still has messages more than a year ago. There is no message on the
> date I allegedly subscribed, of course. That company is a total
> sham. (I've already began a filing of complaint with the FTC.)
> Anyway, I called Verizon back and got a rep that actually
> acknowledged that they are in fact aware of the shady practices of
> BLINKO and she took care of it (crediting me the charges and
> walking me thru an Unscribe, to which the BLINKO system
> responded with an error message, You're not subscribed to any of
> our services! The system that was billing me actually
> acknowledged that I was not a subscriber!

42.     Christine Young, who writes a watchdog column for the Times Herald-Record in

New York, published an article in June 2006 entitled "Phantom charges anger cell users,"

describing another account:

> Mary Verdegaal of Newburgh hardly ever uses her cell phone. "I
> don't have kids; the phone is never on," she told me.  "I don't give
> out the number." So Verdegaal was puzzled last January when just
> three weeks after loading up on prepaid minutes, she ran out. She
> called her carrier, Verizon Wireless, and learned that $19.95 worth
> of airtime had been devoured by "Blinko," which offers
> horoscopes, ringtones and jokes of the day.  Verdegaal had never
> heard of Blinko. "This is a service I neither wanted nor knew that I
> had," she said.

43.     According to the Time Herald-Record article, John O'Malley, vice-president of

public relations at Verizon Wireless, stated that *at least* 10,000 Verizon subscribers "never

authorized" these charges either, and that, according to columnist Christine Young,

> It's not just Verizon users who are complaining. Over the past
> several months I've received a blizzard of e-mails from subscribers

to T-Mobile, Sprint, Alltell, Cingular - all of whom have found
mysterious Blinko charges on their bills and can't get rid of them.

44.    Indeed, thousands of consumers have since complained (both formally and

informally) about Blinko and its business practices, to the press, to various States' Attorneys

General's offices, to the Federal Trade Commission, to cellular phone carriers, to message boards

and webblogs on the internet and to Blinko itself.

45.    According to Noelia Amoedo, Blinko's Vice President of Sales and Operations, "it

is likely that there are records of more than 100,000 calls from customers that could be construed

as registering a complaint to Blinko," and that Blinko has received "hundreds of emails and

internet queries from subscribers" seeking refunds, and has received **3 million** requests to

unsubscribe, despite having had only 4.3 million purported unique subscribers since it began its

operations.

46.    Indeed, according to the Time Herald-Record article, Blinko is one of the many

companies that "invade your cell phone using 'negative option' enrollment."

47.    An unidentified "Scammed Victim" of Blinko's recounts in the Times

Herald-Record's website blog a conversation he had with his carrier,

> Just got off talking to T-mobile representative. I know how Blinko
> is able to charge us without consent. Blinko and T-mobile are in a
> partnership and Blinko has access to T-mobile's billing system.
> They wouldn't tell me if Blinko was actually giving money to
> T-mobile. Furthermore, the customer rep. told me that not replying
> back with a STOP message to a Blinko text call is constituted as
> "acceptance and acknowledgment" of Blinko's services, thereby,
> giving Blinko the go ahead to charge you 10 bucks a month.

48.    According to another Blinko victim, who registered a formal complaint with the

Florida Attorney General's Office in Tallahassee, Florida:

> I, too, have been a victim of this companies fraudulent activities, which in my opinion should be viewed as criminal fraud, versus civil fraud, as in my case, at least, this company sent me an unsolicited text message, stating "Welcome to the SpicyMint Chat! Look for a partner by sending NEW to 69069. Txt LIST for the commands. Txt STOP to cancel. Txt HELP 4 help or call 18003758983." This text message was sent to me 02/07/06 at 4:49pm PST, and was looked at by me at 04:50pm PST. I had no idea what it was, other than spam, and so did nothing (I, until today, had no idea what "Negative option subscriptions for cell phone "ring tones" and similar services" even was, therefore, I did nothing, but grumble to myself, that I was beginning to become the victim of text message spam. Costing me by using my free text messages.... I had no idea at that time such an unsolicited message would result in a charge.  Today, I looked at my Verizon Wireless bill, online, and noticed a $9.99 charge from "Blinko", charged interestingly enough 02/07/2006, at precisely 7:50pm (which upon further investigation by myself, became evident as EST [Eastern Standard Time]  – exactly the same moment that I read the unsolicited message.

49.      In fact, Blinko is currently being investigated by the Economic Crimes Division of the Florida Attorney General's Office in Tallahassee, Florida as relates to "Negative option subscriptions for cell phone "ring tones" and similar services."

50.      As Brian D. explained on New York's Times Herald-Record's website blog recordonline.com:

> Add me to the list of people affected by the Blinko.com scam (or whatever you want to call it). My story is the same as the others listed... I never signed up for it, never wanted it, I'm being fraudulently charged $10 per month for it, Verizon Wireless support is no help, I turned off text messaging, cancelled the blinko.com service (and yet did not actually get cancelled), etc, etc, etc.

51.      Another Blinko victim writes about the "Blinko Scam" on jamsterscam.com, a website devoted to consumer complaints regarding third-party service providers:

13

Same thing... I had a $9.99 "download" charge on my cell phone bill that I never authorized. My phone isn't even capable of downloads, it's like 5 years old! We called Verizon, they were completely unwilling to help, so we contacted Blinko. They are so shady, you can't even call them. You get an automated response that makes you get onto the internet. I sent them a bunch of nasty emails and they wrote back that they were "investigating" the matter. Then they wrote and tried to say they would refund us 9.99. I wrote back and said, yes, you will.... 9.99 x 3 months of billing. Eventually they wrote back and said they agreed to the refund and we should expect a check in 4 to 6 weeks. They're quick to steal your money and not so quick to give it back. Anyhow, 6 weeks comes up in less than a week, and surprise, surprise... nothing yet. How are they allowed to get away with this?

52.    In or about May 2006, Thomas P. from Minnesota complained to the Florida Attorney General's Office about being billed for phone services not requested  "On my cell phone, on 3/9/2006 I started receiving a "daily horoscope" from Blinko.com.  I had not had any previous contact with blinko.com I did not ask for this service and do not want it," while Anna L. complained in September 2005 to the Pennsylvania Attorney's General Office that:

This whole event began on 8/11/05 when a text message was sent to cell phone [redacted] out of the blue.  The text message said thanks for signing up for services with our company.  Since this was unsolicited I immediately emailed T-Mobile to let them know that I received an unsolicited message from what appeared to be a spam company and that I didn't even know who the company was...But as I feared, when I get my cell phone bill from T-Mobile there was a charge for $5.99 for services on 8/11/05 from some company called m-Qube.  8/11/05 is the very date the first unsolicited message was received.  You will notice on Page 11 of my cell phone bill there is a charge listed under premium services. The charge is from a company called m-Qube Mobile with a description of Buongiorno for the amount of $5.99.  This charge is unauthorized and no contact was ever made with this company to initiate services.

14

53.     By allowing consumers to be unwittingly subscribed to its services via "negative option subscriptions," Blinko has caused consumers not only to be charged and billed for services that were never authorized, but has caused them to be sent additional wireless text message spam for which they are charged by their carriers.

**Blinko's Mystery Charges and**
**Refurbished Phone Numbers**

54.     In what Burton Katz, president of Blinko, has publically acknowledged as its "largest challenge," Blinko has been making unsolicited text message calls to what it refers to as "refurbished" mobile phone numbers and billing said owners in what has become known as "mystery" billing:

> "Mystery" billing and refurbished phone numbers. This has become perhaps our largest challenge, and is something we are aggressively working to address with our carrier partners. We have found instances where customers have been charged when that customer acquired a "refurbished" mobile phone number from their carrier. A "refurbished" number is number given to a customer that was previously used by another of the carrier's subscribers. If the previous subscriber failed to cancel their Blinko subscription before giving up the number, the "refurbished" number will continue to be billed. We rely on our carrier partners to regularly provide us with a list of cancelled numbers prior to 'refurbishing' them so that we may scrub our system, which in turn prevents this from happening. However, when it happens, as it does from time to time, our policy is to immediately cancel the subscription and make sure the person with the "refurbished" number who was being billed is wholly compensated.

55.     Indeed, according to Blinko's customer support page on its website, "Occasionally a phone number changes owners and the new number, which was previously subscribed to the service, will keep receiving (and being charged) for the service."

56.     For example, Doug F.  tells his "Blinko fraud" story on jamsterscam.com:

> Here's my story...In April we purchased a new cell phone plan in
> Mass. for my 13 year old daughter.  In less than 2 hours after
> receiving the phone, before we had even left the mall and before
> she had made a single call on the phone, she began to receive
> "dumb blonde" jokes via tex messaging. I found them to be
> offensive in content and was angry that such a thing could happen
> without our consent.  The explanation provided by Verizon was
> that the previous owner of the tel. Number must have subscribed
> and once the number was activated the subscription continued...
> I called another customer service rep later. He finally
> acknowledged that his copy of the bill showed the charges to be
> from BLINKO.COM and that they had received over 4000
> complaints against BLINKO's billing charges. I have refused to pay
> these charges and he told me that they are under investigation.
> After reading everyone else's messages I'll bet that nothing will be
> done and I'll see these charges appear on my next bill.

57.     Blinko lacks effective policies and procedures to ensure that text message calls are not made to consumers who had acquired a "refurbished" mobile phone number from their carrier and that such called parties are not subscribed to and billed for mobile content services that were ordered by, if at all, by the previous owner of the phone number.

**Blinko's Flawed Opt-Out and/or**
**Unsubscription Policies And Practices**

58.     Once a user is subscribed to one of Blinko's services, Blinko, through its policies and practices, makes it exceedingly difficult, if not impossible, for purported subscribers to unsubscribe from its services and to opt-out of receiving future text message calls from Blinko.

59.     According to Blinko's current terms of use, a user can cancel a subscription to Blinko's services by sending a text message with the words "END", "CANCEL", "QUIT",

16

"STOP" or "UNSUBSCRIBE" to the short code for any such services (e.g. 25000, 42222 or 69069), or they can contact customer service on the Blinko's website.

60.     Burton Katz, president of Blinko, however, publically acknowledges that "until recently" unsubscribe requests would "often not go through":

> We have made changes to the system that makes it easier to cancel a Blinko subscription. Until recently, unless a person contacted us by phone or sent a text message back to Blinko saying only the exact word "STOP," the 'unsubscribe' would often not go through. Now the Blinko.com system recognizes "STOP" in many variations and combined with other words or letters. Anyone may also call Blinko's 1-800 customer service number to unsubscribe or make an enquiry. As an added measure, a Blinko representative manually reviews all text messages received weekly to search for messages that were likely unsuccessful attempts to cancel and, when found, cancels them.

61.     For example, Debra from New York describes her inability to cancel Blinko's services on RipOffReport.com, another consumer reporting website:

> This company charges for messages they text to your cell phone.  I did not ask for daily text messages, nor did I ask for their services. They text a message telling you to reply back to 42222 and text "STOP ALL." When you do that they send a message back saying there was an error and refer you to care@blinko.com which does not exist. When you go to Blinko.com there is a form to fill out and they send you a Reference number each time you try to "contact us." They keep charging each [time] they send a text message and it is on a daily basis.  No matter what you do they do not stop and the charges are on the cell phone bill. *** Beware of whoever or whatever this company is.  I never ordered anything from them, nor have I asked for their daily BS text messages.

62.     Similarly, according to Blinko's customer support webpage, "We must warn you to check the help number you are dialing as several customers have been provided by third parties with the incorrect 1-800 number precluding BLINKO from providing you with proper

assistance to specific customer enquiries." Indeed, Blinko was recently required to activate "a

NEW toll free number: 1-800-971-2271." According to Burton Katz, many consumers were

"unable to properly contact" Blinko:

> Since Blinko.com was forced to change our 1-800 customer service
> number to comply with federally-mandated emergency
> management requirements, some carriers have, on occasion,
> provided consumers with incomplete or inaccurate contact
> information. We believe many of the consumers who contacted
> you were frustrated after not receiving the correct information and
> unable to properly contact us. Our CORRECT customer care
> number is 1-800-971-2271, our fax is 786-513-0967 and the email
> address is: care@blinko.com. Customers may also contact us and
> receive information (including terms & conditions of service)
> through our website: www.blinko.com.

63.     Apparently, the help number Blinko provided directly to customers "800-313-

9695" was also an incorrect number, as that number is not in service and re-directs consumers to

a nationwide directory assistance number at 10 15 15 800 which purports to charge users $5.00.

64.     Moreover, even when consumers are able to find a working contact number or

address, Blinko's customer care service, the bulk of which Blinko outsources through a company

in Dubai, rarely, if ever, responds to consumers' calls and/or emails.

65.     Indeed, even when consumers are fortunate enough to get in contact with Blinko

for the purpose of cancelling Blinko's services and opting-out of the receipt of future text

messages, Blinko nonetheless often continues to make such text message calls and to bill

purported subscribers for its services.  For instance, Alex B. sent an email to Blinko's customer

support concerning his grandmother's experience:

> I wrote to you a few weeks ago concerning the cancellation of your
> service and a refund for my grandmother's cell phone.  We have
> received 4 more charges on our cell phone bill, though you claimed

18

that you had removed us from your service, and that we would
receive no further charges.

66.     Moreover, even when a purported subscriber sends a text message back to Blinko

saying only the exact word "STOP," and even when Blinko's computer platform actually

recognizes the request, the computer system is programmed to automatically make at least one

more spam text message call, this time explaining how a purported subscriber can purportedly

"re-subscribe":

> U r now unsubscribed from the PRANK service.  Sorry to lose you.
> To re-subscribe visit blinko.com; 4 questions contact
> care@blinko.com or call 800-313-9695.

### ALLEGATIONS RELATING TO THE NAMED PLAINTIFF

67.     On or about December 9, 2005 at 3:22 p.m., plaintiff Bret Thielen's cell phone

rang, indicating that he had received a text call.  Under his contract with his cell phone service

provider, this cost him ten cents.

68.     The sender field of the transmission contained only the five-digit number: 42222.

69.      Over the next several days, on or about December 12, 2005 at 3:10 p.m. and

December 14, 2005 at 3:23 p.m., 7:19 p.m., and 7:20 p.m., Mr. Thielen received four additional

text messages from the same sender, identified by the five-digit number: 42222.  Mr. Thielen was

charged by his cell phone service provider an additional $0.10 per message for the receipt of each

of these text message calls.

70.     The body of some messages included, for example, distasteful attempts at humor,

to wit, "you're like the Venus De Milo, very nice to look at but not all that there," while the body

of other messages were simply "gibberish," consisting of garbled text that was unreadable.

19

71.     The body of one message, the **fourth** sent Mr. Thielen, with a subject line of "HERE IS ANO....,"and offered him "another chance" to subscribe:

> Here is another chance to receive your text alerts from Blinko.com.
> Simply reply with txt MY PRANK.

72.     On or about December 14, 2005 at 7:20 p.m. Mr. Thielen replied back to the short code 42222 with the words "stop."

73.      A few second later, Mr. Thielen received a fifth text message call from sender 42222, the body of which read:

> U r now unsubscribed from the PRANK service.  Sorry to lose you.
> To re-subscribe visit blinko.com; 4 questions contact
> care@blinko.com or call 800-313-9695.

74.      Mr. Thielen never heard of Blinko or Dirty Hippo prior to receiving the first text message from them.

75.     Mr. Thielen doesn't  know how Blinko got his cell phone number.

76.     Blinko claims it doesn't  know how it got Mr. Thielen's cell phone number either.

77.     Prior to receiving the first text message, Mr. Thielen never saw an ad on the Internet, in a magazine or anywhere else concerning Blinko's services, and never responded to any advertisement offering said services.

78.     Mr. Thielen never entered his telephone number on Blinko's or its affiliates' websites.

79.     Mr. Thielen never sent a text message to Blinko requesting to be sent text messages or to be subscribed to Blinko's services.

80.     Plaintiff never consented to Blinko's sending of text message calls to his telephone number.

81.     Mr. Thielen registered his telephone number on the national do- not- call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government on May 9, 2005.

82.     Mr. Thielen never entered any PIN number on Blinko's or its affiliate advertisers' websites.

83.     Mr. Thielen never replied to a Blinko PIN text message call with a text message confirming activation for Blinko's services.

84.     Plaintiff never willingly or knowingly subscribed to any service from Blinko.

85.     Mr. Thielen never received a welcome message from Blinko.

86.     On or about February 28, 2006, Blinko filed a counterclaim against Mr. Thielen alleging that he agreed to pay $9.99 for each month he was purportedly subscribed to Blinko's MY PRANK mobile content services.

**CLASS ALLEGATIONS**

87.     Thielen brings this action, pursuant to FRCP 23(b)(2) and FRCP 23(b)(3), on behalf of himself and a class (the "Class") consisting of all persons residing in the United States of America who own a cellular telephone number to which Blinko made text message calls to without Blinko's having obtained the called parties' prior express consent.

88.     Upon information and belief, there are thousands of members of the Class who are geographically dispersed, such that joinder of all members is impracticable.

89.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting individual members.  Common questions for the Class include:

(a)     Is Blinko's conduct governed by the TCPA?

(b)     Does the wireless spam Blinko distributed violate the TCPA?

(c)     Are the class members entitled to treble damages based on the willfulness of Blinko's conduct?

(d)     Whether Blinko failed to have in place effective and enforceable policies and procedures for monitoring and controlling affiliate behavior, and to guard against affiliate abuse, including the unauthorized entry of data in Blinko's and its affiliates' websites?

(e)     Whether Blinko lacks effective policies and procedures to ensure that whoever enters a cellular telephone number and/or PIN number on Blinko's or its affiliates' websites is, in fact, authorized to enter said telephone number or PIN number?

(f)     Whether Blinko allowed cell phone numbers to be entered on Blinko's or its affiliates' sites without verification of the potential subscriber's identity, age, or authority to consent to the receipt of text messages to the phone number provided to Blinko?

(g)     Whether Blinko allowed PIN numbers to be obtained from, and thereafter entered on, Blinko's or its affiliates' sites without verification of the potential subscriber's identity, age, and authorization to be both sent text

22

messages to their phone numbers and subscribed to and charged for Blinko's monthly services?

(h)     Whether Blinko allowed consumers to be unwittingly subscribed to its services via "negative option subscriptions, i.e., by failing to respond to a Blinko text call?

(i)     Whether Blinko lacks effective policies and procedures to ensure that text message calls are not made to consumers who had acquired a "refurbished" mobile phone number from their carrier and that such called parties are not subscribed to and billed for mobile content services that were "subscribed for," by whatever method, while the number was assigned to the previous owner of the phone number?

(j)     Whether Blinko's policies and practices prevent purported subscribers from unsubscribing to its services and from opting-out of receiving future text message calls from Blinko?

90.     Mr. Thielen will fairly and adequately protect the interests of the Class, his claims are typical of the claims of the members of the respective classes, and he has retained counsel competent and experienced in class action litigation.

91.     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy because, among other things, (a) joinder of all members of the respective classes is impracticable, and (b) many members of the classes cannot vindicate their rights by individual suits because their damages are small relative to the burden and expense of litigating individual actions.

## COUNT I  - TCPA Violations -
## (47 U.S.C. 227(b)(1)(A)(iii))

92.     Mr. Thielen incorporates by reference the foregoing allegations.

93.     Blinko made unsolicited commercial text calls to the members of the Class using an automatic telephone dialing system and/or using an artificial and prerecorded message to the wireless telephone numbers of the Class.

94.     These calls were made without the prior express consent of the called parties.

95.      Blinko has, therefore, violated the TCPA, 47 U.S.C. 227(b)(1)(A)(iii).

96.     As a result of Blinko's illegal conduct, the members of the class suffered actual damages and, under section 227(b)(3)(B), are each entitled, *inter alia,* to a minimum of $500.00 in damages for each such violation of the TCPA

97.   Because Blinko's misconduct was willful and knowing, the Court should, pursuant to section 227(b)(3)(C),  treble the amount of statutory damages recoverable by the members of the Class.

## COUNT II - TCPA Violations -
## (47 U.S.C. 227(c))

98.     Mr. Thielen incorporates by reference the foregoing allegations.

99.     47 U.S.C. §227 (c) provides that any person "who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may," bring a private action based on a violation of said regulations, which regulations were promulgated to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object.

24

100.     The regulations provide that "No person or entity shall initiate any telephone solicitation" to "(1) Any residential telephone subscriber before the hour of 8 a. m. or after 9 p. m. (local time at the called party's location), or (2) A residential telephone subscriber who has registered his or her telephone number on the national do- not- call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government." 47 C.F.R. §64.1200 (c)

101.     The regulations further provide (at 47 C.F.R. §64.1200 (d)) that "No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards," among others,

> (3) Recording, disclosure of do- not- call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do- not- call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do- not- call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request.
>
> (4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any

25

other number for which charges exceed local or long distance
transmission charges.

102.    47 C.F.R. §64.1200 (e),  provides that §64.1200 (c) and (d) "are applicable to any

person or entity making telephone solicitations or telemarketing calls to wireless telephone

numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278,

FCC 03- 153, 'Rules and Regulations Implementing the Telephone Consumer Protection Act of

1991,'" which Report and Order in turn, provides as follows:

> "The Commission's rules provide that companies making
> telephone solicitations to residential telephone subscribers must
> comply with time of day restrictions and must institute procedures
> for maintaining do-not-call lists. For the reasons described above,
> we conclude that these rules apply to calls made to wireless
> telephone numbers. **We believe that wireless subscribers should
> be afforded the same protections as wireline subscribers**."
> (emphasis added).

103.    Blinko violated 47 U.S.C. §227 (c) by making more than one telephone call within

any 12-month period in violation of the regulations prescribed to each of the affected numbers.

104.    Blinko violated §64.1200 (c) by initiating multiple telephone solicitations (1)

before the hour of 8 a. m. or after 9 p. m. (local time at the called party's location), and/or (2) to

wireless telephone subscribers who registered his or her telephone number on the national do-

not- call registry of persons who do not wish to receive telephone solicitations that is maintained

by the federal government.

105.    Blinko violated § 64.1200 (d) by initiating calls for telemarketing purposes to

wireless telephone subscribers without instituting procedures that comply with the regulatory

minimum standards for maintaining a list of persons who request not to receive telemarketing

calls from it, and in particular by (1) failing to provide called parties with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a working telephone number or address at which the person or entity may be contacted; and (2) failing to put telephone numbers on the do- not- call list at the time the request is made and failing to honor a wireless subscriber's do- not- call request within thirty days from the date of such request.

106.     As a result of Blinko's illegal conduct as alleged herein, the members of the class suffered actual damages and, under section 47 U.S.C. Section 227(c), are each entitled, inter alia, to receive up to $500.00 in damages for each such violation of §64.1200 (c) and (d).

107.     Because Blinko's misconduct was willful and knowing, the Court should, pursuant to section 227(b)(3)(C),  treble the amount of statutory damages recoverable by the members of the Class.

WHEREFORE, Plaintiff Bret Thielen, on behalf of himself and the Class, prays for the following relief:

1.       An order certifying the Class as defined above;

2.       An award of actual and/or statutory damages;

3.       An injunction requiring Blinko to cease all wireless spam activities;

4.       An injunction requiring Blinko to cease billing consumers for mobile content services that they never agreed to purchase;

5.       Reasonable attorney's fees and costs; and

6.       Such further and other relief the Court deems appropriate.

27

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

September 29, 2006

Bret Thielen, individually and on behalf of a class
of similarly situated individuals


  /s/ Bryan G. Kolton   
one of his attorneys

Phillip C. Rogers
Law Office of Phillip C. Rogers
40 Pearl Street, N.W., Suite 336
Grand Rapids, Michigan 49503
Telephone: (616) 776-1176
Telefax: (616) 776-0037
Attorney I.D. No. P34356

John Blim
Jay Edelson
Myles McGuire (Of Counsel)
BLIM & EDELSON, LLC
53 West Jackson Boulevard
Suite 1642
Chicago, Illinois 60604
Telephone: (312) 913-9400
Telefax: (312) 913-9401

John G. Jacobs
Bryan G. Kolton
THE JACOBS LAW FIRM, CHTD.
122 South Michigan Avenue
Suite 1850
Chicago, Illinois 60603
Telephone: (312) 427-4000
Telefax: (312) 427-1850

## CERTIFICATE OF SERVICE

Bryan G. Kolton, an attorney in the foregoing matter, certifies that he caused a copy of the

foregoing document to be served by electronic mail and U.S. Mail on the following counsel:


     Rhett Traband, P.A.
     BROAD AND CASSEL
     2 South Biscayne Boulevard
     Twenty-First Floor
     Miami, Florida 33131

     Thomas Blackwell, Esq.
     SMITH HAUGHEY RICE ROEGGE LLC
     250 Monroe Ave., N.W., Suite 200
     Grand Rapids, Michigan 49503


on this 29th day of September, 2006.


                    /s/ Bryan G. Kolton
                    Bryan G. Kolton